### THE SEA KING.

### THE NANTICOKE.

Circuit Court of Appeals, Second Circuit. November 19, 1928.

No. 34.

6

Foley & Martin, of New York City (James A. Martin and Edward E. Elder, both of New York City, of counsel), for appellant Neptune Line, Inc.

Bigham, Englar & Jones, of New York

City (C. W. Hagen, of New York City, of counsel), for appellee P. Dougherty Co.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). ■ There can be little doubt that the barges were anchored in a safe place. The testimony is all to the effect that barges have constantly been anchored there, and in the United States Coast Pilot it is said as to Newport Harbor that in the outer harbor "the anchorage is anywhere westward of Goat Island and the breakwater extending northward from it. * * * " The barges were all strong seagoing vessels, and the Sea King and Rockville, which seasonably put down two anchors, rode through the storm without drifting. The captain of the Nanticoke was told by the captain of the tug, when he left him, that there were northeast storm warnings, and that the weather looked threatening, and it did not look fit to go to sea. The place selected was customary and safe. Even if anchorage on the east side of Goat Island, close by Newport, would have been in quieter waters, it does not follow that the anchorage selected was improper. Ford, the only apparently disinterested witness, who advocated another anchorage, admitted that he had seen light tows anchored off Jamestown "many times." The judgment of the master of the Neptune was vindicated by the event, for the barges that put down two anchors in season did not drift. The trial court held that the place selected was in all respects as safe a place as was available, and we see no reason to differ from the conclusion that it was at least a proper anchorage.

■ But it is said on behalf of the owners of the Nanticoke that she was not left by the tug at a safe distance from the Sea King. It is clear, however, that unless the Nanticoke had drifted she would have remained from 300 to 400 feet away from the Sea King, and if, as her own master estimated, her original anchorage was 600 feet away, she would still have been from 400 to 500 feet away after both barges had veered out more chain. The theory upon which it is contended that the vessels were too near is that the wind would shift from northeast to northwest, and that the vessels in that event might swing through intersecting arcs and strike. But there is no sufficient evidence that the wind went into the northwest when the barges first came in contact. It was apparently northeast, north by east, or north during the afternoon and evening of December 28th, and it is quite evident that, with the gale coming from these directions, the Sea King could not, in swinging, strike a vessel anchored to the northeast of her and 400 feet away. In the evening of the 28th of December the Sea King was blowing for assistance.

This confirms the story of her master that the barges were in imminent danger long before there was any shift of the wind to the northwest and bears out his story that they came in contact in the evening of December 28th. The Nanticoke must have drifted down before she put out her second anchor, as the captains of the Sea King and Rockville each maintained. The original position of the barges and the extent to which they had paid out chain made it impossible that they should have come in contact in the early evening of December 28th, unless the Nanticoke had dragged her port anchor before she put out her starboard anchor at 7:30 p. m. It was her drifting that caused her to do this, though too late. The Rockville yawed, like the Sea King, but these barges did not collide, because their anchors held and they did not drift. The event confirms the opinion of the court below that the Nanticoke collided with the Sea King because she did not pay out chain or have two anchors down, as the other barges did, until it was too late. We concur with the court below as to the fault of the Nanticoke.

■ But the trial judge held that the tug was bound to come back and care for the barges when the storm became heavy. With this we cannot agree. The anchorage was a safe one, the vessels were left at proper distances from one another, all were equipped for rough weather, and the two barges that used their anchors seasonably rode out the storm safely. It was not reasonable to anticipate that the Nanticoke would fail in ordinary precautions, when she had been warned of the coming gale, and saw it continually increasing, and that she would neglect to use her largest anchor until it was too late. The adrift cases relied on by the trial court are not in point. The whole question is whether the tug left the barges in a safe place in view of the known storm warnings. The storm, both in anticipation and in fact, was not dangerous to seagoing barges left at the anchorage at Jamestown, if they were managed with ordinary skill, and no occasion arose which required the tug to stand by or to return in order to guard against dangers which were due to a neglect of the Nanticoke, which could not have been reasonably anticipated. The Director (C. C. A.) 21 F. (2d) 47; The Battler (C. C. A.) 72 F. 537.

The decree is so modified that the Neptune Line shall recover full damages against the P. Dougherty Company for injuries to the Sea King and that the cross-libel of the latter company for the damages of the Nanticoke be dismissed.